UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW K. KASSEL,

                                    Plaintiff,

            v.

THE CITY OF MIDDLETOWN,
JOSEPH DESTEFANO, TOM
AMODIO, SAM BARONE, NICHOLAS
BARBER, LOU MORSE, DON LUIS,
PAUL SMITH, and MICHAEL
DEMCHAK,

                                    Defendants.

No. 14-CV-8922 (KMK)

OPINION & ORDER

Appearances:

Kent A. Eiler, Esq.
Kelly A. Magnuson, Esq.
Michael W. MacOmber, Esq.
Tully Rinckey PLLC
Albany, NY
*Counsel for Plaintiff*

Alex J. Smith, Esq.
Middletown, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Matthew K. Kassel ("Plaintiff"), a former member of the Middletown Fire

Department ("Fire Department"), brings this Action against the City of Middletown

("Middletown"), Joseph DeStefano ("DeStefano"), Tom Amodio ("Amodio"), Sam Barone

("Barone"), Nicholas Barber ("Barber"), Lou Morse ("Morse"), Don Luis ("Luis"), Paul Smith

("Smith"), and Michael Demchak ("Demchak" and collectively, "Defendants"), alleging (1)

discrimination in violation of the Uniformed Services Employment and Reemployment Rights

Act ("USERRA"), 38 U.S.C. § 4301, et seq., N.Y. Exec. Law § 290, et seq., and N.Y. Mil. Law

§ 242, et seq.; (2) retaliation under 38 U.S.C. § 4311(b) and N.Y. Exec. Law § 290, et seq.; and (3) hostile work environment resulting in the denial of benefits of employment under 38 U.S.C. § 4311(a), N.Y. Mil. Law § 242, et seq., and N.Y. Exec. Law § 290, et seq. Plaintiff and Defendants have each moved for summary judgment on all of Plaintiff's causes of action. (*See* Dkt Nos. 80, 88.) For the reasons to follow, Plaintiff's Motion is denied and Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual History

The following facts are taken from the documents submitted and the Parties' respective statements pursuant to Local Civil Rule 56.1.[1] The facts as described below are not in dispute, except to the extent indicated.

Plaintiff served as a member of the Fire Department and the New York Air National Guard (the "National Guard"). (*See* Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 17 (Dkt. No. 94); Defs.' Resp. to Pl.'s Rule 56.1 Statement ("Defs.' 56.1 Resp.") ¶ 17 (Dkt. No. 99).) The Fire Department consists of both volunteer and paid firefighters, (*see*

---

[1] Plaintiff's Rule 56.1 Response is lacking in certain critical attributes. For example, Plaintiff's response fails to provide support in the record to substantiate many of his own statements, as required by Rule 56.1(d). *See* S.D.N.Y. Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Plaintiff sought to rectify this issue in his September 28, 2016 letter to the Court, where certain citations were provided, and which were assertedly "omitted due to clerical error." (Dkt. No. 104.) However, there remain several uncited statements in Plaintiff's Response. (*See, e.g.*, Pl.'s Rule 56.1 Response Statement and Additional Statement of Facts in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ¶¶ 16, 20, 24, 28, 35, 38). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Plaintiff's response has failed in this regard. Accordingly, where Plaintiff has offered no citation to admissible evidence in the record, the Court will consider that fact undisputed by Plaintiff.

Defs.' Rule 56.1 Statement in Supp. of Defs.' Mot. for Summ. J. ("Defs.' 56.1") ¶ 1 (Dkt. No. 81); Pl.'s Rule 56.1 Response Statement and Additional Statement of Facts in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s 56.1 Resp.") ¶ 1 (Dkt. No. 98)), and all named individual defendants are either current or former members of the Fire Department, (*see* Pl.'s 56.1 ¶¶ 3–10; Defs.' 56.1 Resp. ¶¶ 3–10). [2]

During the relevant time, Plaintiff was a paid firefighter with the Fire Department, (*see* Pl.'s 56.1 ¶ 17; Defs.' 56.1 Resp. ¶ 17), and as such was subject to the requirement set forth by the State of New York that he complete 100 hours of in-service training within a calendar year, (*see* Defs.' 56.1 ¶ 3; Pl.'s 56.1 Resp. ¶ 3).[3] During his tenure, Plaintiff sought to become a Lieutenant at the Fire Department, (*see* Pl.'s 56.1 ¶ 20; Defs.' 56.1 Resp. ¶ 20), which would

---

[2] Defendants have argued that the "Additional Facts" in Plaintiff's 56.1 Response should be disregarded because Defendants were unable to respond. (*See* Dkt. No. 102.) However, the Court granted Defendants leave to reply and therefore this argument is moot. (*See* Dkt. No. 107.) Defendants also have alleged that Plaintiff's "Additional Facts" attempt to create a genuine issue of material fact at summary judgment by contradicting his own deposition testimony on the status of his training by way of a declaration. (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") 2–5 (Dkt. No. 111).) While Defendants are correct that Plaintiff may not create a fact dispute at summary judgment by contradicting his own deposition testimony by way of a declaration, *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991), that is not the case here. Plaintiff has testified that he was "on schedule" and that he was not "behind in [his] training for the year 2013, as of September 2013," (Decl. of Kelly Magnuson, Esq. in Supp. of Pl.'s Mot. for Summ. J. ("Magnuson Decl.") Ex. A ("Pl.'s Dep.") 45–46), which is consistent with his declaration, (*see* Decl. of Kelly Magnuson, Esq. in Opp'n to Defs.' Mot for Summ. J. Ex. A ("Pl.'s Decl.") ¶¶ 10–15 (Dkt. No. 96)). The declaration does not contradict Plaintiff's prior testimony, but rather clarifies and further explains it. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("[A] material issue of fact may be revealed by . . . subsequent sworn testimony that amplifies or explains, but does not merely contradict, . . . prior testimony.") (citations omitted). At summary judgment, "the [C]ourt . . . should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998), *amended by* 169 F.3d 782 (2d Cir. 1998).

[3] Plaintiff's 56.1 statement indicates that he was a volunteer firefighter, but it is undisputed that he was paid by the Fire Department, (*see, e.g.*, Defs.' 56.1 ¶ 14; Pl.'s 56.1 Resp. ¶ 14), and that he was subject to the training requirements for paid firefighters, (*see* Defs.' 56.1 ¶ 3; Pl.'s 56.1 Resp. ¶ 3).

have put him at the helm of a group of roughly seven paid firefighters, (*see* Defs.' 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2). On June 15, 2013, Plaintiff took the Fire Department's promotion exam to become a Lieutenant, (*see* Pl.'s 56.1 ¶ 20; Defs.' 56.1 Resp. ¶ 20), ultimately receiving the highest score of any candidate who completed the exam in June 2013, (*see* Pl.'s 56.1 ¶ 28; Defs.' 56.1 Resp. ¶ 28).[4] The Chief of the Fire Department, Amodio, an Assistant Chief, Luis, and the Mayor of the City of Middletown, DeStefano, then evaluated those candidates who took the exam. (*See* Defs.' 56.1 ¶ 16; Pl.'s 56.1 ¶ 32; Pl.'s 56.1 Resp. ¶ 16.)

In September 2013, not long after Plaintiff completed the Lieutenant's exam, he met in the parking lot near Middletown's Central Fire House with then-Chief of the Fire Department Amodio. (*See* Pl.'s 56.1 ¶ 23; *see also* Decl. of Kelly Magnuson, Esq. in Supp. of Pl.'s Mot. for Summ. J. ("Magnuson Decl.") Ex. B ("Amodio Dep.") 111 (Dkt. No. 95).)[5] Plaintiff claims that the impetus for this meeting was a September 4, 2013 call he received from New York Air National Guard Senior Master Sergeant John Wilson, the Fire Chief at Stewart Air National Guard Base ("Base") in Orange County, New York ("Wilson"), who informed Plaintiff that Amodio had contacted a commander at the Base to ask why the Base was using Middletown firefighters to fulfill their manning requirements and avoid paying overtime. (*See* Pl.'s 56.1 ¶ 21.)[6] During his meeting with Amodio, Plaintiff presented a PowerPoint, (*see* Pl.'s 56.1 ¶ 23; *see also* Amodio Dep. 111), which according to Plaintiff was about USERRA and his

---

[4] This exam is a prerequisite for members of the Fire Department who seek to become a paid Lieutenant. (*See* Defs.' 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.)

[5] Defendants dispute this fact in their 56.1 Response, (*see* Defs.' 56.1 Resp. ¶ 23), though their citation to Amodio's deposition directly corroborates the existence of the meeting and does not offer an alternate version of events.

[6] Defendants dispute the occurrence of any call between Amodio and the unnamed commander. (*See* Defs.' 56.1 Resp. ¶ 22; Amodio Dep. 109.)

reemployment rights under the law, (*see* Pl.'s 56.1 ¶¶ 24–25). Plaintiff requested he be permitted

to forward the PowerPoint to Lieutenant David Guattery, a request that Amodio approved. (*See*

Pl.'s 56.1 ¶ 26; Defs.' 56.1 ¶ 26.) At the conclusion of this meeting, Amodio indicated that he

was not the "driving force" behind the Fire Department's attention on military leave, (Pl.'s 56.1

¶ 27; Amodio Dep. 112), and indicated that it was Luis who took exception to Plaintiff's requests

for additional time off from work at the Fire Department, (*see* Pl.'s 56.1 ¶ 27; Amodio Dep. 112).

In October 2013, the Fire Department determined that it had two openings for Lieutenant

positions. (*See* Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) On October 28, 2013, Plaintiff received

a text message from Amodio requesting that he report to DeStefano's office for an interview for

one of the two Lieutenant positions. (*See* Pl.'s 56.1 ¶ 29; Defs.' 56.1 Resp. ¶ 29.) When Plaintiff

arrived, he was greeted by DeStefano, Amodio, and Luis. (*See* Pl.'s 56.1 ¶ 30; Defs.' 56.1 Resp.

¶ 30.) These three individuals comprised what Defendants term the "Committee," (Defs. 56.1

¶ 16), and conducted interviews of the top firefighters from the June 2013 promotion list who

were seeking promotion to the rank of Lieutenant, (*see id.*; Pl.'s 56.1 ¶ 31; Defs.' 56.1 Resp.

¶ 31).

The Parties present vastly different versions of what took place in the interview itself.

According to Plaintiff, the interview began with DeStefano explaining that candidates would be

graded by all three members of the Committee, and promotions would be awarded based on the

ranking of the candidates' interview scores. (*See* Pl.'s 56.1 ¶ 32.) After this introduction,

Plaintiff claims that he provided the Committee with copies of his resume and a letter of

recommendation from Wilson praising Plaintiff's reliability and supervisory skills. (*See* Pl.'s

56.1 ¶¶ 33–34; *see also* Magnuson Decl. Ex. A ("Pl.'s Dep.") 53.) Plaintiff then proceeded to

answer the Committee's questions, which, according to Plaintiff, began with a discussion of the

military and Plaintiff's obligations therewith.  (Pl.'s 56.1 ¶¶ 36–37; *see also* Pl.'s Dep. 53–56.)

While Plaintiff does not dispute that he first brought up his military service, (*see* Defs. 56.1 ¶ 29;

Pl.'s 56.1 Resp. ¶ 29), he alleges it was DeStefano who initiated the conversation regarding his

military duties, (*see* Pl.'s 56.1 ¶¶ 36–37; *see also* Pl.'s Dep. 55).  According to Plaintiff, the

questions DeStefano asked highlighted a departmental concern for Plaintiff's ability to balance

his dueling obligations to the National Guard and the Fire Department.  (*See* Pl.'s 56.1 ¶ 37.)

These questions covered Plaintiff's work at the Base, whether he chose to be there on his own

accord, (*see* Pl.'s Dep. 56), and whether he was paid to be at the Base or if he was purely serving

in a volunteer capacity, (*see id.*).  In response, Plaintiff encouraged the members of the

Committee to call Wilson, which allowed Plaintiff to elaborate upon Wilson's recommendation

and to discuss the extensive training that Plaintiff received at the Base.  (*See* Pl.'s 56.1 ¶ 38.)

Not surprisingly, Defendants' version of the interview is different.  Rather than DeStefano

inquiring with Plaintiff about his military obligations, Defendants assert that it was Plaintiff who

first brought up his military service and proceeded to use it as an excuse throughout the

interview.  (*See* Defs.' 56.1 ¶ 22; *see also* Magnuson Decl. Ex. C ("DeStefano Dep.") 237–43.)

Specifically, the Committee was concerned that Plaintiff was the farthest behind in his

mandatory training of any firefighter and that he would not successfully complete the 100 hours

required of him in 2013.  (*See* Defs.' 56.1 ¶ 22; *see also* Magnuson Decl. Ex. M ("Luis Dep.")

157.)  This was critical, because Plaintiff could lose his certification as a firefighter were he not

to meet this requirement.  (*See* DeStefano Dep. 132.)  Defendants were otherwise underwhelmed

by Plaintiff's interview performance, finding that he had difficulty answering the questions asked

of him and consistently deflected blame for his failure to be on track to reach his training

requirements.  (*See* Defs.' 56.1 ¶¶ 21–22; *see also* DeStefano Dep. 237–43.)  When prompted to

explain his training shortfall, Plaintiff "repeatedly brought up the military, blamed the military for his lack of training," (DeStefano Dep. 126–27), as he was ordered to be at the Base and was unable to "pick his [military] schedule," (*id.* at 228). In response to the Committee's concerns regarding his training shortfall, Plaintiff explained that he did not require additional training with the Fire Department "because he was getting training at the Stewart Air Force [B]ase." (*Id.* at 127.) Still, from Defendants' perspective, Plaintiff was unable to explain how he could successfully supervise firefighters and ensure they reached their own training requirements, while failing to complete his own annual training. (*See* Defs.' 56.1 ¶ 20; *see also* DeStefano Dep. 149). Ultimately, DeStefano, who is allegedly the ultimate decision maker for the Lieutenant positions, (*see* Amodio Dep. 135), believed that Plaintiff's interview performance was "horrible," because Plaintiff was "defensive" and "unable to answer questions regarding his training and regarding his ability to supervise," (DeStefano Dep. 113; *see also* Defs.' 56.1 ¶ 21).

At the close of Plaintiff's interview, DeStefano called Wilson to clarify certain statements made by Plaintiff during the interview. (*See* DeStefano Dep. 163–65; *see also* Pl.'s 56.1 ¶ 44.) This conversation was not related to Wilson's recommendation of Plaintiff, (*see* Pl.'s 56.1 ¶ 44; Defs.' 56.1 Resp. ¶ 44), but rather to determine if there was a "difference between being ordered [to the Base] as part of [the] military requirements and getting orders after [one] volunteer[s]," (DeStefano Dep. 127).[7] According to DeStefano, Wilson clarified that when Plaintiff volunteered for duty, he was technically receiving orders to be at the Base. (*See id.* at 140–41.)

---

[7] The general nature of this call is not in dispute, as Defendants do not actually deny that DeStefano specifically called Wilson to ask about whether Plaintiff was ordered to be at the Base or if he was volunteering for duty and receiving orders based on volunteering. (*See* Pl.'s 56.1 ¶ 43; DeStefano Dep. 165.)

In assessing candidates, including Plaintiff, for the Lieutenant positions, the Committee utilized a score sheet that rated the candidates in 10 separate categories and would add up the scores across the categories at the completion of each interview. (*See* Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) Plaintiff scored 26.66, while the two other individuals who interviewed for the position, Fire Inspector Adam McCarey ("McCarey") and firefighter Joseph Carpenter ("Carpenter"), each scored 40.33. (*See* Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) The Committee then discussed the candidates and ranked the three individuals, with Carpenter ranked first, then McCarey, then Plaintiff. (*See* Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) After Carpenter was offered the first Lieutenant position, the Committee interviewed Demchak for the second position pursuant to civil service regulations, and compared his performance to that of McCarey and Plaintiff. (*See* Defs.' 56.1 ¶ 19; Pl.'s 56.1 Resp. ¶ 19.) Demchak received a score of 42, the highest of the remaining candidates, and was therefore offered the second Lieutenant position. (*See* Defs.' 56.1 ¶ 19; Pl.'s 56.1 Resp. ¶ 19.) Demchak later became Plaintiff's supervisor in March 2014. (*See* Pl.'s 56.1 ¶ 63; Defs.' 56.1 Resp. ¶ 63.)

It was not until December 4, 2013 that Plaintiff learned the Committee had selected Carpenter, who had ranked third in the promotional exam, for promotion to one of the two available Lieutenant positions. (*See* Pl.'s 56.1 ¶ 48; Defs.' 56.1 Resp. ¶ 48.) Plaintiff then approached Smith to discuss this decision on December 19, 2013, wherein Smith told Plaintiff that, although Plaintiff was "the number one pick, hands down," (Pl.'s 56.1 ¶ 50; Defs.' 56.1 Resp. ¶ 50), Carpenter was ultimately promoted instead because Plaintiff failed to show up for work and "[t]hey couldn't promote a guy that isn't here," (Pl.'s 56.1 ¶ 50; Defs.' 56.1 Resp. ¶ 50). Smith reiterated this during a conversation with Plaintiff on January 2, 2014, where he told Plaintiff that he would not be promoted due to his National Guard service and the associated

absences.  (*See* Pl.'s 56.1 ¶ 52; Defs.' 56.1 Resp. ¶ 52.)  On January 24, 2014, Plaintiff spoke

with Carpenter, who informed Plaintiff that he had heard from DeStefano that he was selected for

promotion because the Committee believed Carpenter's time abuse was not as bad as it appeared

to be.  (*See* Pl.'s 56.1 ¶¶ 54–55; Defs.' 56.1 Resp. ¶¶ 54–55.)

A few days later, on January 30, 2014, Plaintiff learned that Demchak, who had ranked

fourth on the promotional exam, was to be selected for promotion to the second, and only,

remaining Lieutenant position in the Fire Department.  (*See* Pl.'s 56.1 ¶ 56; Defs.' 56.1 Resp.

¶ 56.)  That same day, Plaintiff met with then-First Assistant Chief Morse, who informed him

that his frequent absences caused the Committee to pass him over for the Lieutenant positions.

(*See* Pl.'s 56.1 ¶¶ 57–58; *see also* Magnuson Decl. Ex. K ("Morse Dep.") 105–06.)  Several

months later, in May 2014, Morse told Plaintiff that he ought to "be careful" of Luis and Barber,

(*see* Pl.'s 56.1 ¶ 66; Defs.' 56.1 Resp. ¶ 66), though Defendants dispute that this was in the

context of Plaintiff's military service or his invocation of rights under USERRA, (*see* Defs.' 56.1

Resp. ¶ 66).

In July 2014, Plaintiff spoke with Barone regarding a newly announced Lieutenant

vacancy at the Fire Department.  (*See* Pl.'s 56.1 ¶ 67; Defs.' 56.1 Resp. ¶ 67.)  In fact, Barone

had requested a new promotional exam for the Lieutenant positions, which would replace the

June 2013 list on which Plaintiff had placed first.  (*See* Pl.'s 56.1 ¶ 68; Defs.' 56.1 Resp. ¶ 68.)

In October 2014, Barone told Plaintiff that he would be unable to park in his usual parking spot

because a cabinet had been placed in his spot.  (*See* Pl.'s 56.1 ¶ 69; Pl.'s Dep. 83; Magnuson

Decl. Ex. I ("Barone Dep.") 164–65.)  Barone claims his orders were based on Plaintiff's failure

to follow orders, as Plaintiff had moved the cabinet without permission.  (*See* Barone Dep. 164–

65.)

Plaintiff filed the instant Action on November 10, 2014.  (*See* Compl. (Dkt. No. 1).)  As part of Plaintiff's Rule 26 disclosure on February 25, 2015, he provided Defendants with taped recordings of conversations he had with fellow firefighters and superior officers in the Fire Department between December 2013 and March 2014.  (*See* Defs.' 56.1 ¶¶ 35–36; Pl.'s 56.1 Resp. ¶¶ 35–36.)  This, however, was not the first time that DeStefano, Barber, and Amodio had learned of Plaintiff possibly secretly recording conversations with others in the Fire Department. (*See* Defs.' 56.1 ¶ 34; Pl.'s 56.1 Resp. ¶ 34.)  On March 3, 2015, Middletown officials and the firefighters union held a joint meeting to discuss, inter alia, a new employment agreement.  (*See* Pl.'s 56.1 ¶ 72; Defs.' 56.1 ¶ 72.)  Plaintiff alleges that union representatives, including Demchak, conveyed to the firefighters present that the secret recordings would lead to adverse repercussions for union members, (*see* Pl.'s 56.1 ¶ 73), while Defendants counter, and Plaintiff admits, that the firefighters merely expressed disappointment over the recordings, (*see* Defs.' 56.1 ¶ 37; Pl.'s 56.2 Resp. ¶ 37).  According to Plaintiff, after the disclosure of the recordings he became isolated from the rest of the Fire Department, (*see* Pl.'s 56.1 ¶ 77), and provides as an example a firefighter canceling plans to swap shifts with him "[d]ue to the current events," as well as a general lack of conversation with his colleagues, (Pl.'s 56.1 ¶ 78; Defs.' 56.1 Resp. ¶ 78; *see also* Pl.'s Dep. 92).

Ultimately, on April 16, 2015, Plaintiff was informed that he would be suspended without pay for 30 days because of the recordings.  (*See* Pl.'s 56.1 ¶ 80; Defs.' 56.1 Resp. ¶ 80; *see also* Letter from Kent A. Eiler, Esq. to Court (Apr. 27, 2015) ("Apr. 27 Letter") 1 (Dkt. No. 26).)  However, this disciplinary charge was ultimately rescinded.  (Aff. of Alex Smith, Esq. in Supp. of Defs.' Mot. for Summ. J. ("Smith Aff.") ¶ 80 (Dkt. No. 87).)

B.  Procedural History

Plaintiff initiated this Action by filing a Complaint on November 10, 2014.  (*See* Dkt. No. 1.)  On January 28, 2015, Defendants filed their Answer.  (*See* Dkt. No. 6.)  The Parties then entered into a discovery schedule.  (*See* Dkt. No. 15.)

However, on March 17, 2015, less than a month after the start of discovery, Plaintiff filed an Order To Show Cause pursuant to Federal Rule of Civil Procedure 65(a) and 38 U.S.C. § 4323(d)(1)(a), requesting that:

> (1) Defendants be restrained and enjoined from harassing and/or making threats to other members, firefighters, and employees of the Fire Department and that there would be adverse consequences as a result of the content of the material included in the Initial Disclosures; (2) Defendants be restrained and enjoined from punishing other firefighters at Middletown as a result of the content of the material included in the Initial Disclosures; (3) Defendants be restrained and enjoined from investigating Plaintiff for a possible adverse personnel action in connection with the Initial Disclosures; (4) Defendants be restrained and enjoined from placing Plaintiff on administrative leave and/or suspension and/or termination of employment during the pendency of the Action; (5) Defendants be enjoined from additional discrimination, harassment, retaliation, and reprisal action against Plaintiff; and (6) the City take adequate control of the actions of its employees and that Defendants be enjoined from engaging in additional discrimination, harassment, and retaliation against Plaintiff.

(Dkt. No. 20.)

The Court scheduled a hearing on April 17, 2015, (*see* Dkt. No. 16), which was rescheduled for May 6, 2015 at the request of Plaintiff's counsel, (*see* Dkt. No. 25).  Before the hearing, Plaintiff filed a letter dated April 27, 2015, informing the Court that he had been unilaterally suspended from the Middletown Fire Department, without pay, effective April 16, 2015.  (*See* Apr. 27 Letter at 1.)  Plaintiff attached a letter from Barone, the Chief of the Fire Department, to Plaintiff that stated that Plaintiff was suspended for the recordings and "as a result of [his] misconduct [he had] lost the trust and confidence of [his] superior officers and fellow firefighters."  (Apr. 27 Letter Ex. A 1.)  After a two-day oral argument on May 6 and 7,

2015, the Court granted in part and denied in part Plaintiff's motion for a preliminary injunction to the extent that the April 16, 2015 Notice of Discipline directed at Plaintiff and Defendants' investigation in connection therewith were to be stayed pending further order of the Court and denied the remainder of Plaintiff's Order To Show Cause. (*See* Order (May 14, 2015) (Dkt. No. 32).) On May 20, 2015, Defendants filed an interlocutory appeal of the May 14 Order. (*See* Dkt. No. 34.) Subsequently, on May 28, 2015, the Court received an Order To Show Cause for "reconsideration of or re-argument from th[e] Court's Order entered May 14, 2014, or, in the alternative, a stay or modification of said Order pending appeal," (Dkt. No. 39), as well as supporting papers, (*see* Dkt. Nos. 40–44). Defendants subsequently withdrew their motion for reconsideration, as well as their interlocutory appeal, and the Court consequently denied the motion as moot on June 26, 2015. (*See* Dkt. No. 54.)

In the midst of this, Plaintiff filed an Amended Complaint on June 3, 2015. (*See* Dkt. No. 46.) Defendants filed their Answer to the Amended Complaint on June 19, 2015. (*See* Dkt. No. 52.) Discovery closed on May 26, 2016. (S*ee* Dkt. No. 75.) On June 8, 2016, Plaintiff filed a premotion letter requesting a premotion conference and leave to file a Motion for Summary Judgment. (*See* Dkt. No. 76.) Shortly thereafter, on June 13, 2016, Defendants filed a premotion letter requesting leave to file a Cross-Motion for Summary Judgment. (*See* Dkt. No. 77.) On July 13, 2016, the Court held a premotion conference wherein it set a briefing schedule for the proposed motions. (*See* Dkt. (minute entry for July 13, 2016).) Pursuant to the briefing schedule, (*see* Dkt. No. 79), the Parties filed their respective Motions for Summary Judgment on September 1, 2016. (*See* Dkt. Nos. 80–95.)[8] Plaintiff filed his opposition on September 15,

---

[8] Plaintiff appears to have had technical difficulties in filing his Motion on September 1, 2016, and properly filed his motion on ECF on September 15, 2016. (*See* Dkt. Nos. 88–95.)

2016, (see Dkt. Nos. 96–98), while Defendants filed their opposition on September 21, 2016, (see Dkt. Nos. 99–101). On September 23, 2016 Defendants wrote to the Court seeking leave to file a reply to Plaintiff's opposition. (See Dkt. No. 102.) On September 28, 2016, Plaintiff responded to Defendants' request, and similarly requested leave to file a reply to Defendants' opposition. (See Dkt. No. 104.) On September 29, 2016, the Court granted Plaintiff's request and set a deadline of October 11, 2016. (See Dkt. No. 105). The Court then clarified on October 6, 2016 that Defendants' request to file a reply was likewise granted and subject to the same deadline. (See Dkt. No. 107.) The Parties filed their reply papers on October 11, 2016. (See Dkt. Nos. 108–12.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Aurora Commercial Corp. v. Approved Funding Corp., No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the

nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs.*

*Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323–24 (1986)).

B.  Analysis

 "The purpose of USERRA is to encourage military service 'by eliminating or

minimizing the disadvantages to civilian careers' . . . ." *Serricchio v. Wachovia Secs. LLC*, 658

F.3d 169, 174 (2d Cir. 2011) (quoting 38 U.S.C. § 4301(a)).  In particular, USERRA protects

members of the uniformed services, including those who are military reserves, *see Mock v. City*

*of Rome*, 910 F. Supp. 2d 429, 431 (N.D.N.Y. 2012), from discrimination on the basis of their

military service, and provides, in relevant part, that:

> [a] person who is a member of, . . . has performed, . . . or has an obligation to
> perform service in a uniformed service shall not be denied . . . retention in
> employment, promotion, or any benefit of employment by an employer on the
> basis of that membership, . . . performance of service, . . . or obligation[.]

38 U.S.C. § 4311(a).

New York State law also protects public sector employees from discrimination on the

basis of their military service.  N.Y. Mil. Law § 242.  For example, New York Military Law

§ 242(4) provides that no public officer who is ordered on military duty "shall be subjected . . . to

any loss or diminution of . . . vacation or holiday privileges, or any other right or privilege, by

reason of such absence, or be prejudiced, by reason of such absence, with reference to

continuance in office or employment . . . or promotion." *Id.*  The standard for recovery under

§ 242 parallels USERRA.  *See Wang v. N.Y.S. Dep't of Health*, 966 N.Y.S.2d 327, 333 (N.Y. Sup.

Ct. 2013) ("Section 242 is substantively and textually similar to USERRA and is intended to

serve the same remedial objective.").

## 1. Burden-Shifting Framework for USERRA Claims

The Court must first determine whether the Title VII burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), or the two-step burden-shifting analysis of *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), should be applied when determining whether discrimination in violation of USERRA has occurred. *See Fink v. City of New York*, 129 F. Supp. 2d 511, 519 (E.D.N.Y. 2001) (noting that "[s]ome courts have applied the standard Title VII *McDonnell Douglas* burden-shifting framework to the USERRA context," though "a majority" of courts have applied the burden-shifting framework discussed in *NLRB v. Transportation Management Corp.*). Courts in the Second Circuit have determined that "the *NLRB* framework is the preferable approach for USERRA cases," *id.* at 520, following the precedent set in *Gummo v. Village of Depew,* 75 F.3d 98 (2d Cir. 1996), *see Pfunk v. Cohere Commc'ns, LLC*, 73 F. Supp. 3d 175, 190 (S.D.N.Y. 2014) ("To determine whether an employer has violated [§ 4311], courts in th[e] [Second] Circuit apply the burden-shifting framework for actions under the National Labor Relations Act." (citing *Gummo*, 75 F.3d at 106)); *Mock*, 910 F. Supp. 2d at 432 ("USERRA discrimination claims employ a two-pronged burden-shifting analysis."); *Woodard v. N.Y. Health and Hosps. Corp.*, 554 F. Supp. 2d 329, 348 (E.D.N.Y. 2008) ("The appropriate framework for analyzing USERRA claims is the two-pronged burden-shifting analysis of *NLRB v. Transportation Management Corp.*"), *aff'd in relevant part*, 350 F. App'x 586 (2d Cir. 2009). The Court will therefore follow Second Circuit precedent and analyze Plaintiff's USERRA claims under the two-step burden-shifting framework described in *NLRB v. Transportation Management Corp.*

Under this framework, the employee first has the burden of showing, by a preponderance of evidence, that his protected status was "a substantial or motivating factor in the adverse

employment action." *Gummo*, 75 F.3d at 106 (alteration and internal quotation marks omitted); *see also Woodard*, 554 F. Supp. 2d at 348 (same). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Lapaix v. City of New York*, No. 13-CV-7306, 2014 WL 3950905, at *5 (S.D.N.Y. Aug. 12, 2014) (internal quotation marks omitted); *see also Mock*, 910 F. Supp. 2d at 433 (same). This may be proven via "direct or circumstantial evidence, including an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar records or offenses." *Lapaix*, 2014 WL 3950905, at *5 (alteration omitted). A motivating factor "is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink*, 129 F. Supp. 2d at 520 (internal quotation mark omitted).

When the employee has met this burden, "the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." *Woodard*, 554 F. Supp. 2d at 349 (internal quotation marks omitted); *see also Pfunk*, 73 F. Supp. 3d at 189 (same). "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001). Therefore, on each of Plaintiff's USERRA claims, the Court must determine whether there is sufficient evidence from which a rational jury could infer that Plaintiff's status or conduct as a reservist was a motivating factor in Defendants' alleged actions, and if so, whether there is sufficient evidence from which a rational jury could

infer that Defendants would have acted in the same manner regardless of Plaintiff's military status.

### 2. Failure to Promote Claim as Against Barone, Barber, & Morse

#### a. USERRA

As an initial matter, Defendants move for summary judgment as to Plaintiff's failure to promote claims against Defendants Barone, Barber, and Morse on the basis that these individuals are not employers under USERRA. (*See* Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") 17 (Dkt. No. 82).)[9] USERRA defines "employer" as:

> any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including—
> (i) a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities;
> (ii) the Federal Government;
> (iii) a State;
> (iv) any successor in interest to a person, institution, organization, or other entity referred to in this subparagraph; and
> (v) a person, institution, organization, or other entity that has denied initial employment in violation of [§] 4311.

38 U.S.C. § 4303(4)(A). The Court notes that it is undisputed that the Committee members (Amiodo, DeStefano, and Luis) were directly involved in the decision not to promote Plaintiff. (*See* Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)[10] The question then, is whether Barone, Barber, and

---

[9] Defendants did not move for summary judgment as to these individuals for the retaliation and hostile work environment claims. Therefore, the Court does not assess USERRA's applicability to these individuals as it relates to those claims.

[10] Plaintiff has offered no citation to admissible evidence in the record in response to Defendants' statement, supported by testimony, that only the members of the Committee were involved in the promotional decision. (*See* Defs.' 56.1 ¶ 16.) Therefore, the Court will consider that fact undisputed.

Morse, also can be held responsible for the decision not to promote Plaintiff to the rank of Lieutenant.[11]

Here, Plaintiff's case falters, as he points to no evidence that any of these individuals was involved in the ultimate decision not to promote Plaintiff to the rank of Lieutenant, or compelled the members of the Committee to do so.  In fact, Plaintiff admits that he has no basis for his belief that Barone, Barber, or Morse participated in the denial of his promotion beyond the fact that they are "Chiefs" and that it "seemed like a logical thing to do to consult all the supervisors when considering an individual for a promotion."  (Pl.'s Dep. 114.)  As to Barone and Barber specifically, Plaintiff asserts that Barber's opinion "would have been considered," which, according to Plaintiff, was that he "didn't think members of the Reserve or National Guard should allow their military obligation to interfere with their performance of their primary job," (*id.* at 114–15), while Barone, "refused to promote anyone . . . and left [a Lieutenant position] vacant for over a year . . . to avoid promoting [Plaintiff] or . . . another national guardsman," (*id.* at 115).

Yet, Plaintiff's theory regarding Barone, Barber, and Morse is directly controverted by the undisputed fact that only DeStefano, Amodio, and Luis—as members of the Committee— were present in the interview, scored and ranked the potential candidates for promotion, and were the only decisionmakers in that process.  (*See* Defs. 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)  Plaintiff's testimony to the contrary, that non-Committee members were somehow involved in the promotional decision, is conclusory and wanting of any evidence in the record, and thus "not

---

[11] Defendants' motion as to Smith and Demchak is inapplicable, as Plaintiff's Amended Complaint specifically omits Smith or Demchak from his failure to promote claims, (*see* Am. Compl. ¶¶ 78–79, 87, 109, 127), and nowhere in his submissions does Plaintiff attempt to claim that either Smith or Demchak had any role in the decision to not promote Plaintiff.  Thus, the Court does not address any claim for failure to promote against Smith or Demchak.

enough to withstand summary judgment." *Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003). Based on the express definitions in the statute, only those individuals who have authority or input over hiring and firing or promotion can have liability as "employers" under USERRA. *Croft v. Village of Newark*, 35 F. Supp. 3d 359, 368 (W.D.N.Y. 2014) (internal quotation marks omitted); *see also Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F. Supp. 2d 953, 967 (N.D. Ohio 2008); *Brandsasse v. City of Suffolk*, 72 F. Supp. 2d 608, 618 (E.D.Va. 1999). Therefore, Defendants' Motion for Summary Judgment on this claim is granted to the extent of the failure to promote claims brought under USERRA against Defendants Barone, Barber, and Morse.[12]

### b. New York State Human Rights Law

The New York State Human Rights Law ("NYSHRL") also protects employees from discrimination "in compensation or in terms, conditions or privileges of employment" "because of" an individual's military status. N.Y. Exec. Law § 296(1)(a). However, individual liability is not limited to supervisors or "employers," as § 296(6) provides for aiding and abetting liability for individuals without "supervisory or hiring/firing power." *Torres v. N.Y. Methodist Hosp.*, No. 15-CV-1264, 2016 WL 3561705, at *12 (E.D.N.Y. Jan. 7, 2016); *see also Feingold v. New York*, 366 F.3d 138, 157–58 (2d Cir. 2004) (same). The Second Circuit has found that, under § 296(6), "an individual defendant may be held liable under the aiding and abetting provision of the

---

[12] In *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), the Supreme Court found that the theory of cat's paw liability was applicable in the USERRA context. Specifically, the Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422 (emphasis and footnotes omitted). Here, however, the lack of any evidence that Defendants Barone, Barber, or Morse played any role, or had any input, in the promotional decision precludes the possibility of any potential cat's paw liability for Barone, Barber, and Morse.

NYSHRL if he 'actually participates in the conduct giving rise to a discrimination claim.'"

*Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)).

Plaintiff's NYSHRL claim meets the same fate as his USERRA claim, as Plaintiff has

failed to put forth any evidence that Barone, Barber, or Morse had any input or participation in

the decision to not promote him. Again, while Plaintiff has posited that these three individuals

played some role in the promotional determination, (*see* Pl.'s Dep. 114–116), he has not provided

a single specific example of how Barone, Barber, or Morse participated in the process in any

manner. Plaintiff's claim is ultimately premised upon his "opinion that regardless of whether the

Chiefs attended or didn't attend the interview for promotion that they would at least have an

opportunity to weigh in with their opinion." (*Id.* at 114.) Yet, this opinion is both belied by the

record, (*see* Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16), and unsupported by Plaintiff's own

testimony, as he admits that no one ever "t[old] [him] that was the process that was followed,"

(Pl.'s Dep. 114). Therefore, Defendants' Motion for Summary Judgment is granted as to the

failure to promote claims brought under the NYSHRL against Defendants Barone, Barber, and

Morse.

### 3. Failure to Promote Claims as to Middletown, DeStefano, Amodio, & Luis

#### a. USERRA & New York Military Law Claim

Applying the aforementioned two-pronged burden-shifting approach of *NLRB v.*

*Transportation Management Corp.*, the Court concludes that a reasonable jury could find that

Plaintiff has met this initial burden, because he has provided sufficient evidence to suggest that

his employer improperly considered his military service during the promotional process, and that

this led to the failure to promote Plaintiff to the rank of Lieutenant. Prior to his interview,

Plaintiff spoke to Amodio, informing him of his rights under USERRA. (*See* Pl.'s 56.1 ¶¶ 23–24.) Further, Amodio testified that he informed Plaintiff at this meeting that he was not the "driving force" behind any of the focus on Plaintiff's military leave, (Amodio Dep. 112), from which a reasonable jury could infer that Plaintiff's military status was indeed a substantial element in the evaluation process. Following this conversation, Plaintiff then received an interview for a Lieutenant position. Yet, despite the fact that Plaintiff had the top score on the Lieutenant exam, (*see* Pl.'s 56.1 ¶ 28; Defs.' 56.1 Resp. ¶ 28), two other individuals who ranked third and fourth were ultimately promoted instead of Plaintiff, (*see* Pl.'s 56.1 ¶¶ 48, 56). At the interview itself, Plaintiff's military obligations appeared to be one of the central points of discussion. For example, Plaintiff was asked at least once about his military obligations, specifically regarding whether he could "balance his obligations to the New York Air National Guard and the Middletown Fire Department." (Pl.'s 56.1 ¶ 37; *see also* DeStefano Dep. 240 (confirming that Plaintiff was asked what he could do to "minimize the impact" of his military obligations on his firefighter duties).) Indeed, DeStefano's notes indicate that Plaintiff "[b]ecame more defensive about the military questions" and Plaintiff asked whether it would "hold him back" in the promotion process. (DeStefano Dep. 241.) Luis also admitted that "he . . . asked [Plaintiff] a question about his military service," and "the way [Plaintiff] presented his answer, [Luis] felt that the military was the priority over the fire department." (Luis Dep. 156.)

DeStefano's behavior after the interview further supports Plaintiff's claim of USERRA liability. After the interview ended, DeStefano contacted Wilson, not to verify any details of his reference, but rather to ask whether there was a "difference between being ordered [to the Base] as part of [one's] military requirements and getting orders after [one] volunteer[ed]." (DeStefano Dep. 127). During his deposition, DeStefano admitted that he believed there was a distinction

between "being ordered [to the Base] and offering, volunteering, and then getting orders." (*Id.* at 165.) However, whether Plaintiff was "volunteering for duty" at the Base or being ordered to appear is a distinction without a difference. The fact that Plaintiff volunteered for, or voluntarily accepted military orders, is of no import in finding liability under USERRA, because, "whether or not [Plaintiff's] orders were voluntary, firing a reservist because he or she receives military orders violates the plain language of [§] 4311." *Pfunk*, 73 F. Supp. 3d at 190. Thus, a reasonable jury could find that Plaintiff's military service was a motivating factor for the decision not to promote Plaintiff, and thus find Defendants liable for USERRA violations. *See Croft*, 35 F. Supp. 3d at 372 (holding that comments by a chief that the plaintiff was not promoted because he "wasn't around enough," and that "the only place [the plaintiff] had been was military duty," was evidence that the defendant was "resistant to promoting [the] [p]laintiff, at least in part, because of [the] [p]laintiff's military obligations" (alterations and internal quotation marks omitted)); *Mock*, 910 F. Supp. 2d at 434 (finding that the defendant's statements that the plaintiff was "always out playing war games" to be "evidence which suggest[ed] [the plaintiff's] military status was a motivating factor, as [was] the fact that [the plaintiff] was passed over multiple times for promotions despite his high scores on promotional exams." (internal quotation marks omitted)); *Fink*, 129 F. Supp. 2d at 520 (noting that "[m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration" (internal quotation marks omitted)).

Although Plaintiff has met his prima facie burden of proof, Defendants "may nonetheless escape liability by showing, as an affirmative defense, that [they] would have made the same decision without regard to [Plaintiff's] protected status." *Fink*, 129 F. Supp. 2d at 520. To support this defense, Defendants claim that Plaintiff would not have been promoted to Lieutenant

regardless of his military status, as he failed to meet specific qualifications that were essential to the position. (Defs.' Mem. 4–8.) A reasonable jury could choose to credit Defendants' explanation that Plaintiff was not promoted, not because of his military obligation, but because Plaintiff (1) was behind on his mandatory training; (2) fared poorly in his interview, in part by being defensive and angry; or (3) did not have the requisite leadership qualities to be a Lieutenant. (*See id.*)

Defendants primarily rest their promotion decision on Plaintiff's failure to meet the required 100-hour training requirement and his explanation for this shortfall. Said otherwise, a reasonable jury could find that Defendants would have made the same decision to not promote Plaintiff even if he had not had a military obligation, based solely on the fact that Plaintiff is alleged to have been the furthest behind of all candidates in his training requirements. It is undisputed that firefighters have a state-mandated 100-hour in-service training requirement, (Defs.' 56.1 ¶ 3; Pl.'s 56.1 Resp. ¶ 3), and that Lieutenants are in charge of verifying compliance with that requirement as to all firefighters beneath them, (*see* Luis Dep. 58–59; Magnuson Decl. Ex. D 39-40.) Plaintiff's failure to meet his training requirements in a timely fashion was not uncommon, per Luis, who testified that "[h]e lapsed up to the time that he was told, you had X amount of time to fulfill your X amount of required responsibilities." (Luis Dep. 179.) It was noteworthy to Luis that Plaintiff was serially behind in his training, and that Plaintiff, at the time of the interview, was alleged to be the farthest behind in his training. (*See id.*)

Further, DeStefano testified that Plaintiff's military service was not itself the issue; rather it was that Plaintiff was unequipped to train other firefighters—a core duty of the Lieutenant position—given that he "was not in a position to meet [his] training requirements." (DeStefano Dep. 232.) Amodio corroborated this, stating that there was a concern regarding Plaintiff's

absences, not due to his military obligations, but rather because he would not "be able to catch up to do his 100 hours" of training. (Amodio Dep. 76.) Taken together, this evidence might support Defendants' affirmative defense that Plaintiff was not promoted for bona fide reasons having nothing to do with his military service.

However, the issue of Plaintiff's training is the subject of a genuine dispute. Plaintiff argues, and Defendants do not dispute, that he never in fact failed to complete his training requirements during, or prior to, the year in question. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 5 (Dkt. No. 97); *see also* Luis Dep. 179 (testifying that "[Plaintiff] always got [his training] done" and that there was "never a year that [Plaintiff] didn't meet the [training] requirement".) Indeed, Plaintiff testified that he was "on schedule" regarding his training and that he was not "behind in [his] training for the year 2013, as of September 2013." (Pl.'s Dep. 45–46.) Moreover, Plaintiff was "surprised" to hear from Luis that he was allegedly far behind on his training, as the interview was the first time he was told of this. (*see id.* at 49).[13] By contrast, while Defendants do not dispute that Plaintiff ultimately completed his training, Defendants present declarations of Smith and Luis stating that Plaintiff was anywhere between 25 and 30 hours behind, which was significantly more than other firefighters. (*See* Reply Aff. of Paul Smith ¶¶ 4–5 (Dkt. No. 109); Reply Aff. of Don Luis ¶¶ 3–5 (Dkt. No. 110).) However, it is not the role of the Court at summary judgment to resolve this factual clash. Rather, this is a paradigmatic case of "he said, she said," or more accurately "he said, they said." *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (explaining that a "question of 'he said, she said,'" in the discrimination context, is one on which the court

---

[13] In support of this contention, Plaintiff submitted a declaration stating that he was only three to four hours behind at the time of his interview and that he ultimately caught up well before the deadline. (Pl.'s Decl. ¶¶ 10–11.)

cannot "take a side at the summary judgment stage"); *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *2 (S.D.N.Y. Oct. 30, 2015) ("Where each party tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.")  Accordingly, the Parties' cross-Motions for Summary Judgment as to the failure to promote claims under USERRA and New York Military Law § 242 are denied.

### b.  New York State Human Rights Law

As previously discussed, Plaintiff also brings his failure to promote claim pursuant to New York Executive Law § 290.  Contrary to the two-pronged approach in USERRA cases, the Second Circuit analyzes claims pursuant to NYSHRL under the familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas*.  *See McDuffie v. Eli Lilly & Co.*, No. 04-CV-5995, 2009 WL 857069, at *5 (S.D.N.Y. Mar. 31, 2009) ("Claims pursuant to the NYSHRL are analyzed under the three-part burden shifting test established in *McDonnell Douglas*.")

> Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).  "The employee at all times bears the burden of persuasion to show a retaliatory motive."  *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

Substantively, the first two steps of the USERRA framework applying the *NLRB v., Transportation Management Corp.* framework are no different from the first two steps of the *McDonnell Douglas* framework.  *See Fink*, 129 F. Supp. 2d at 519 ("The difference is solely that the *McDonnell Douglas* framework has three steps . . . shifting the burden back to the plaintiff to

show that the defendant's alleged non-discriminatory reason is a pretext for discrimination."). As such, upon revisiting the analysis in the USERRA context, both Plaintiff and Defendants have satisfied their initial burdens under the *McDonnell Douglas* framework.

Now, under the NYSHRL, Plaintiff must show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001) (internal quotation marks omitted). "The plaintiff may do this by presenting additional evidence, or by relying on the evidence that supported the plaintiff's prima facie case." *Villanti v. Cold Spring Harbor Cent. Sch. Dist.*, 733 F. Supp. 2d 371, 384 (E.D.N.Y. 2010). "If the plaintiff cannot prove the presence of such a pretext by a preponderance of the evidence, then summary judgment is appropriate." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 833 (S.D.N.Y. 2013).

Plaintiff's failure to promote claim under the NYSHRL also survives because there is a dispute as to whether Defendants' "training" rationale is pretextual. As an initial matter, Defendants' own testimony contradicts their position that Plaintiff's training shortfall was the ultimate reason he was not promoted. For example, as previously discussed, Amodio testified that he informed Plaintiff he was not the "driving force" behind any of the focus on Plaintiff's military leave. (Amodio Dep. 112.) Furthermore, DeStefano testified that he noted in the interview that Plaintiff "[b]ecame more defensive about the military questions," (DeStefano Dep. 240), allowing for a reasonable inference that DeStefano was concerned with Plaintiff's military obligations, despite the fact DeStefano also testified that "the whole issue was he was not meeting his training guidelines," (*id.* 345). Lastly, Luis admitted "he . . . asked [Plaintiff] a question about his military service, and that at the time the way [Plaintiff] presented his answer, [Luis] felt that the military was the priority over the fire department." (Luis Dep. 156.)

However, Luis then testified that it was merely Plaintiff's "absence" and lack of training that bothered him. (*Id.* at 157.) This testimony contradicts itself, as well as the underlying rationale offered by Defendants, which could allow a reasonable jury to determine that Defendants' stated reasons are pretext. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) ("A plaintiff may prove [pretext] by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate . . . reasons for its action."); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 231 (E.D.N.Y. 2010) ("This contradictory testimony . . . could lead a reasonable jury to conclude that [the defendant's] stated reasons were a pretext.").

Plaintiff further notes that, despite the fact that he had the top score on the Lieutenant exam, (*see* Pl.'s 56.1 ¶ 28; Defs.' 56.1 Resp. ¶ 28), two similarly situated individuals who ranked third and fourth were promoted instead, (*see* Pl.'s 56.1 ¶¶ 48, 56).[14] Regardless of this discrepancy, Plaintiff consistently testified that he was "on schedule" regarding his training and that he was not "behind in [his] training for the year 2013, as of September 2013," (Pl.'s Dep. 45-46), and was only three to four hours behind at the time of his interview, (*see* Pl.'s Decl. ¶¶ 10–11). Moreover, Plaintiff testified that he was not merely "surprised" to hear that he was the furthest behind on his training, (Pl.'s Dep. 49), but that he was first told this in the interview itself, a mere month prior to the deadline set by the Fire Department, (*see* Pl.'s Decl. ¶¶ 13, 15). The Court has acknowledged that Defendants dispute this point, (*see* Reply Aff. of Paul Smith ¶¶ 4–5; Reply Aff. of Don Luis ¶¶ 3–5), but again, it is not the role of the Court at summary judgment to resolve this factual dispute. Accordingly, the Parties' cross-Motions for Summary Judgment as to the failure to promote claim under the NYSHRL are denied.

---

[14] Additionally, at least one of these individuals apparently also had training shortfalls, as DeStefano testified that Carpenter "had [a] problem with missing training." (DeStefano Dep. 197.)

4. Retaliation

a. USERRA

Plaintiff also claims that Defendants retaliated against him, in violation of 38 U.S.C.

§ 4311(b), once Plaintiff asserted his rights under USERRA. "[T]o make out a prima facie case

of retaliation under USERRA, a plaintiff must show that (1) he was engaged in protected

activity; (2) that the employer was aware of that activity; (3) that the plaintiff suffered an adverse

employment action; and (4) that there was a causal connection between the protected activity and

the adverse action." *Lapaix*, 2014 WL 3950905, at *6 (internal quotation marks omitted). A

"materially adverse" employment action includes acts "such as termination, demotion

accompanied by a loss of pay, or a material loss of benefits or responsibilities that significantly

alters the terms or conditions of his employment." *Croft*, 35 F. Supp. 3d at 370 (alterations and

internal quotation marks omitted); *see also Hunt v. Klein*, No. 10-CV-2778, 2011 WL 651876, at

*5 (S.D.N.Y. Feb. 10, 2011) (same), *aff'd*, 476 F. App'x 889 (2d Cir. 2012). A plaintiff may

demonstrate a causal connection under the fourth element "(a) indirectly by showing that the

protected activity was followed closely by discriminatory treatment; (b) indirectly though other

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c)

directly through evidence of retaliatory animus." *LaSalle v. City of New York*, No. 13-CV-5109,

2015 WL 1442376, at *6 (S.D.N.Y. Mar. 30, 2015) (applying Title VII and 42 U.S.C. § 1981)

(internal quotation marks omitted). As with his failure to promote claims, Plaintiff must make

"an initial showing by the employee that military status was at least a motivating or substantial

factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of

evidence, that the action would have been taken despite the protected status." *Sheehan*, 240 F.3d

at 1014.

Plaintiff's retaliation claim partially rests upon Defendants' failure to promote him. There is no disputed issue of fact as to either prongs one and two of Plaintiff's prima facie case. Plaintiff alleges that he informed Amodio of his protections under USERRA, specifically his reemployment rights, on September 6, 2013. (*See* Pl.'s Dep. 16; Magnuson Decl. Ex. O at 2, 4, 10.) This was, according to Plaintiff, a response to questions from Amodio regarding the nature of his military duties and whether it would be interfering with his Fire Department obligations. (*See* Pl.'s Dep. at 15–16.) Amodio does not offer a disputed version of events, as he admits the meeting took place and admits that Plaintiff showed him a PowerPoint at this meeting (though he does not specify the subject matter of that PowerPoint). (*See* Amodio Dep. 111–125.) USERRA anticipates that individuals may take alternate steps or "actions" to seek enforcement of USERRA prior to filing a formal complaint with the secretary of labor or filing a civil action. *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 854–55 (8th Cir. 2002) (finding an informal discussion with fellow employees was enough to serve as the basis of a protected activity for a charge of retaliation).

Plaintiff can establish an indirect causal connection based on the contemporaneous nature of the invocation of his rights and the decision to not promote him. *See LaSalle*, 2015 WL 1442376, at *6. The interview took place less than two months after the discussion with Amodio, an amount of time that the Second Circuit has found to be sufficient for the purpose of establishing temporal proximity. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 180 (2d Cir. 2005) (finding two months to be sufficiently temporally proximate); *accord Garrett v. Garden City Hotel, Inc.,* No. 05-CV-962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("A period of only two months between a protected activity and an adverse action may permit a

reasonable jury to find the acts to be temporally proximate and causally related." (alteration and internal quotation marks omitted)).

Even so, as discussed above, there is a genuine dispute as to the reasons that Plaintiff was not promoted to the rank of Lieutenant, as Defendants have offered myriad reasons that purport to explain the rationale for their decision to not promote Plaintiff that are unrelated to the invocation of his USERRA rights in September 2013. (*See supra*.) This dispute precludes summary judgment on Plaintiff's retaliation claim in so far as it is rooted in the failure to promote.

Plaintiff's retaliation claim further relies upon Defendants' decision to suspend Plaintiff in April 2015 in response to the filing of this Action. Plaintiff easily satisfies the first three prongs of his retaliation claim: Plaintiff commenced the instant Action against Defendants on November 10, 2014, (*see* Compl.), which was expressly done to enforce his rights under USERRA and New York law; Defendants, as parties to the suit, were aware of this activity; and Plaintiff suffered the adverse employment action of being suspended, without pay, from his position at the Fire Department. Besides his own "[i]mpression" that this was retaliatory, (Pl.'s Dep. 124), Plaintiff relies upon the discrepancy in prior punishment to show causation, as he had been discovered secretly recording a conversation with Barber in April 2014, (*see* Magnuson Decl. Ex. L ("Barber Dep.") 59–62). At that time, prior to the filing of Plaintiff's suit, it was not recommended that Plaintiff be disciplined for the secret recordings. (Barber Dep. 61.) Yet, in 2015, once the suit had been filed, Plaintiff was subject to suspension without pay for nearly identical recordings. (Apr. 27 Letter Ex. A.) This discrepancy in punishment, coupled with the temporal proximity between Plaintiff's suit and the suspension, *see Summa v. Hofstra Univ.*, 708

F.3d 115, 128 (2d Cir. 2013) ("This Court has recently held that even gaps of four months can support a finding of causation."), is sufficient to meet Plaintiff's prima facie burden.

In response, Defendants assert that the suspension was not a reaction to Plaintiff's lawsuit, but rather a direct result of "[Plaintiff's] surreptitious recordings of his superiors and fellow firefighters[, which] was a serious breach of the trust and loyalty essential to the operation of the [Fire Department]." (Defs.' Mem. 22.)  A reasonable jury could credit this version of events, as Barone testified that the firefighters "were very concerned about their safety and whether they could trust [Plaintiff] in an emergency position in the future." (DeStefano Dep. 326.)  This fear appeared to permeate the Fire Department, as Lieutenants Smith and Carpenter both sent emails to Barone in April 2015 highlighting that they could no longer trust Plaintiff and felt betrayed by his actions. (*See* Magnuson Decl. Ex. P.)  This disintegration of trust among Plaintiff's fellow firefighters could be important in the context of a fire department, where "trust between superiors and their subordinates, as well as an officer's reputation amongst fellow officers, is of the utmost importance." *Cruz v. Liberatore*, 582 F. Supp. 2d 508, 519 (S.D.N.Y. 2008); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987) (noting that a fire department has a legitimate interest in maintaining "esprit de corps" among members of the volunteer fire department (internal quotation marks omitted)); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) (same).

Defendants appear, however, to concede that there is indeed a genuine dispute as to whether a rationale jury would accept that argument.  Specifically, Plaintiff surreptitiously recorded conversations in the firehouse in April 2014, was caught by Barber, who informed his superiors, but did not recommend any punishment for that conduct. (*See* DeStefano 287–89, 326–27; Barber Dep. 59–62.)  Several months later, and after this case was filed, additional

recordings came to light and Plaintiff was subsequently suspended. Once the individuals involved in the April 2014 recording realized this discrepancy in punishment, they admitted to withdrawing the suspension only because it would be "too difficult for the City to defend itself against a retaliation claim." (Smith Aff. ¶ 80.) A reasonable jury could determine that in March 2015, Plaintiff's second set of recordings were either a step too far for the Fire Department, or that the Fire Department had developed a retaliatory motive. At this stage, it is not for the Court to make that credibility judgment on disputed facts. Accordingly, the Parties' Motions are denied.

### b. New York State Human Rights Law

As noted, Plaintiff also brings retaliation claims under the NYSHRL, which is to be analyzed under *McDonnell Douglas* burden-shifting framework, *see Zann Kwan*, 737 F.3d at 843 ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."), though the analysis as to Plaintiff's prima facie case and Defendant's non-discriminatory reasons for Defendants' actions in both failing to promote and suspending Plaintiff are identical, *see Lapaix*, 2014 WL 3950905, at *8. Therefore, both Plaintiff and Defendants have satisfied their initial burdens under the *McDonnell Douglas* framework, and Plaintiff is now required to rebut Defendants' burden of production by making a showing that Defendant's non-discriminatory defenses are pretext. *See Abrams*, 764 F.3d at 251.

To show pretext in the context of a retaliation claim under both the NYSHRL and Title VII, "a plaintiff . . . must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)). This showing of "but-for" causation, however, "does not require proof that retaliation was the only

cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action[,] [as] [f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* In this context, the Court notes that the Second Circuit has cautioned that "[t]he determination of whether retaliation was a 'but-for' cause . . . is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Id.* at 846 n.5.

Here, Plaintiff's retaliation claim survives because there is a genuine dispute as to whether his suspension was pretextual. Plaintiff asserts that his suit to vindicate his rights under USERRA and the NYSHRL was a clear motivating factor for Defendants' actions. As discussed, Plaintiff had been discovered secretly recording a conversation with Barber in April 2014. (*See* Barber Dep 59–62.) Barber promptly informed DeStefano and Amodio, making them aware that Plaintiff had surreptitiously recorded conversations in the firehouse. (*See* DeStefano 287–289, 326–27; Barber Dep. 59–62.) However, Barber testified that he did not recommend Plaintiff for discipline when he informed DeStefano and Amodio about the secret recordings, (*see* Barber Dep. 61), nor was Plaintiff ever punished or admonished for these actions, (*see* DeStefano 287–289, 326–27). Defendants acknowledge that the optics of punishing Plaintiff only after he filed his suit was not ideal, as they admit to only withdrawing the suspension because it would be "too difficult for the City to defend itself against a retaliation claim." (Smith Aff. ¶ 80.) This admitted discrepancy in punishment between the initial recording incident and the subsequent

2015 incident, coupled with the temporal proximity between Plaintiff's suit and the suspension, is sufficient to thwart summary judgment. *See Zann Kwan*, 737 F.3d at 847 (holding that a discrepancy in punishment or explanation, "coupled with the temporal proximity between the complaint and the termination" supports a finding that a reasonable jury may find the complaint to be a but-for cause of the retaliatory conduct); *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 665 (E.D.N.Y. 2015) (holding that the plaintiff had satisfied her burden with respect to pretext because, among other things, the defendants "fail[ed] to present credible evidence that [the plaintiff] had been informed before her date of termination that lateness was a problem" and the evidence "primarily consist[ed] of contradictory deposition testimony," which made summary judgment inappropriate). Therefore, the Parties' cross-Motions for Summary Judgment for retaliation under both USERRA and the NYSHRL are denied.

<u>5. Hostile Work Environment</u>

As noted previously, USERRA protects service members from denial of "any benefit of employment" by an employer because of their service. 38 U.S.C. § 4311(a). However, there has been considerable debate as to whether the statute allows for a claim of a hostile work environment. Specifically, prior to November 21, 2011, USERRA defined "benefit of employment" as "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice . . . ." *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 175 (5th Cir. 2011). Upon examining this language, the Fifth Circuit in *Carder* held that, because USERRA omitted the phrase "terms, conditions, or privileges of employment," there was no cause of action for hostile work environment under the statute. *Id.* at 178 ("Congress's choice to not include the phrase 'terms, conditions, or privileges of employment' or similar

wording in USERRA weighs in favor of the conclusion that USERRA was not intended to provide for a hostile work environment claim to the same extent as Title VII and other anti-discrimination statutes containing that phrase.").

Shortly thereafter, Congress amended the definition of "benefit of employment" to include the "terms, conditions, or privileges of employment." Pub. L. No. 112–56, tit. II, § 251, 125 Stat. 711, 729 (codified as amended at 38 U.S.C. § 4303(2)). Following this amendment, some courts have determined that hostile work environment claims are actionable under USERRA, *see, e.g.*, *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13–CV–6500, 2014 WL 4269126, at *7 (N.D. Ill. Aug. 28, 2014) ("In light of the amendment addressing the Fifth Circuit's precise concern, it seems clear that the Fifth Circuit now would find a hostile work environment claim cognizable under USERRA."), while other courts have held that such claims were always actionable, *see, e.g.*, *Tridico v. District of Columbia*, 130 F. Supp. 3d 17, 31 (D.D.C. 2015) ("USERRA provides for a hostile work environment claim." (internal quotation marks omitted)); *Montoya v. Orange Cty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 1013 (C.D.Cal. 2013) ("[T]he Court defers to Congress's opinion that the 2011 Amendment was intended to clarify, not change the scope of USERRA, and thus hostile work environment claims have always been cognizable under USERRA.").

The courts' uncertainty in this arena has resulted in "very little case law examining a hostile work environment claim in the context of USERRA," and thus courts have "incorporate[d] the standards and case law used to evaluate hostile work environment claims under Title VII." *Montoya*, 987 F. Supp. 2d at 1016 (collecting cases).[15] To establish a hostile

---

[15] Claims under the NYSHRL are analyzed identically to claims under Title VII. *See Massie v. Metro. Museum of Art*, No. 11–CV–9549, 2015 WL 3833839, at *6 (S.D.N.Y. June 22, 2015) (holding that Title VII, the NYSHRL, and § 1981 hostile work environment claims are

work environment claim, Plaintiff must produce evidence that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment." *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004) (alterations and internal quotation marks omitted). In general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The test for determining whether a workplace is a hostile work environment has both subjective and objective elements. *See id.* "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

When determining whether an objectively hostile work environment exists, courts must consider the totality of the circumstances, including the frequency, severity, and offensiveness of the allegedly discriminatory conduct, whether the conduct was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance. *See Patterson*, 375 F.3d at 227. The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009). "Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (internal quotation marks omitted). Even still, "an

---

analyzed the same way); *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 551 n.2 (S.D.N.Y. 2014) ("The same standards govern hostile work environment claims under Title VII, [§] 1981, and the NYSHRL.").

employer's motion for summary judgment must be denied if the claimed misconduct ranks sufficiently highly on either axis." *Id.* "Where reasonable jurors could disagree as to whether alleged incidents of . . . insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227. Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Richards v. N.Y.C. Dep't of Educ.*, No. 13-CV-16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015) (internal quotation marks omitted).

Plaintiff sets forth various actions that he alleges demonstrates he was subject to a hostile work environment. For example, Plaintiff asserts that some, though not all, of the firefighters stopped speaking to him after he filed his suit, (*see* Pl.'s Dep. 91), and that this group of individuals "distanced themselves from [Plaintiff]" and "had less to talk to [him] about," (*id.* at 93).[16] With regard to the Chiefs, Plaintiff believed that Amodio was "second guessing [Plaintiff]" and "mak[ing] [him] feel as though [he] was at risk of being written up." (Pl.'s Dep. 117.) Both Barone and Morse were "overly critical" and Plaintiff "always f[elt] . . . on the edge of being brought up on charges of insubordination," or "written over nothing." (*Id.* at 118–19.) Luis in particular was "aggressively trying to find a way to write [him] up . . . looking for something to second guess [him] on and write [him] up." (*Id.* at 119.) Plaintiff, however, cannot identify a specific instance where he was actually second guessed or written up for insubordination, though Luis once verbally accused him of being insubordinate. (*See Id.*)

---

[16] Plaintiff admits that a reason for any isolation he felt may have been due to the discovery by other firefighters in the Fire Department that he had been secretly recording them. (*See* Pl.'s Dep. 95 ("Q. Did it occur to you when you were being further isolated from your coworkers that the reason why was they learned you secretly tape recorded them? A. I understood that could be a factor, yes.").)

Plaintiff further claims that Demchak made a remark asking if "it burn[s] [Plaintiff's] ass for [him] to call [Demchak] [L]ieutenant," and that Demchak was "actively working against [and] undermining [Plaintiff]," though he has not identified any examples. (*Id.* at 121.) Smith, however, appears to be the focus of certain specific actions that Plaintiff identifies as cultivating a hostile work environment. For example, Plaintiff claims that Smith, "repeatedly demeaned [Plaintiff's] military service, stating that "he was the talk . . . of 2014" and he was not promotable due to his military service. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 17 (Dkt. No. 93).) Plaintiff felt insulted by Smith, who stated that Plaintiff "spen[t] most of [his] time sitting at Air National Guard, doing nothing. The whole world knows it." (*Id.*) Plaintiff also claims that Smith, joining with Demchak and others, "mocked" Plaintiff for not being promoted. (*Id.* at 17–18.) This, according to Plaintiff, ultimately culminated in emails to Barone in April 2015, wherein Smith stated that it was "'impossible' to work with [Plaintiff]," (*id.* at 18), which then led to Plaintiff's suspension, (*see id.*).

Here, taking into consideration the totality of the circumstances, the Court finds that the conduct at issue was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. None of the conduct at issue involved physical harassment, and while the handful of alleged statements by Smith, including that Plaintiff "spen[t] most of [his] time at Air National Guard, doing nothing[,]" were rude and unbecoming of a colleague, they were not actionable under USERRA or the NYSHRL. *See Mock* 851 F. Supp. 2d at 434 ("None of the alleged conduct, including the telephone calls to [the plaintiff's] wife, inquiries with his [r]eserve unit, the comment about him playing war games, nor the notations in his performance evaluations were severe or pervasive enough to constitute a hostile work environment."). With respect to the isolation claim, Plaintiff makes no showing that his coworkers' refusal to socialize with him,

making him feel isolated, excluding him from conversation, and refusing to swap shifts with him, was at all connected to his military service. In fact, it appears based on Plaintiff's deposition that this isolation was a result of the disclosure of his secret recording of his colleagues, who, not surprisingly, "didn't appreciate [him] secretly recording conversation." (Pl.'s Dep. 93–97.) Moreover, the mere fact that there was "just a general lack of conversation," (*id.* at 92), is insufficient to create a hostile environment, particularly given that Plaintiff gives no specific examples of this behavior beyond this general assertion, *see, e.g.*, *Hanson v. County of Kitsap*, 21 F. Supp. 3d 1124, 1146 (W.D. Wash. 2014) (finding that the plaintiff's showing of a general refusal to socialize with him, resulting in isolation or exclusion from conversations was not "sufficiently severe or pervasive to alter the conditions of his employment" (internal quotation marks omitted)). While Plaintiff asserts that his subjective impression was that his superiors undermined him at every turn and that they "added [a] level of scrutiny on [his] actions . . . regardless of how well [he] perform[ed]," (Pl.'s Dep. at 104–05), this does not amount to an objectively offensive conduct, because "the behavior was not severe, physically threatening, or humiliating." *Vega-Colon v. Wyeth Pharms.*, 625 F.3d 22, 32 (1st Cir. 2010) (granting summary judgment on a USERRA hostile work environment claim where the conduct was limited to name calling, and generally "negative commentary on [the plaintiff's] absences for military service"); *see also Mock*, 851 F. Supp. 2d at 434; *cf. Alfano*, 294 F.3d at 370, 378–81 (reversing jury verdict for the plaintiff based on a handful of comments/pranks discussing the plaintiff's sexual practices and displaying a vulgar cartoon depicting a subordinate with whom the plaintiff allegedly had improper physical contact). The record is devoid of sufficient evidence from which a rational factfinder could find that Plaintiff's working conditions were altered by intimidation, ridicule, or insult because of his military service.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim is granted and Plaintiff's cross-Motion is denied.

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion is granted in part and denied in part. Plaintiff's failure to promote claims against Defendants Barone, Barber, and Morse, and Plaintiff's hostile work environment claims against all Defendants are dismissed. The Court will hold a status conference on October 30, 2017 at 11:30 AM. The Clerk of Court is respectfully directed to terminate the pending Motions. *(See* Dkt. Nos. 80, 88.)

SO ORDERED.

Dated: September 28, 2017
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE